1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID WESSEL,

11        Petitioner,                    No. CIV S-08-1082 WBS CHS P

12        vs.

13   D.K. SISTO, et al.,

14        Respondents.         FINDINGS AND RECOMMENDATIONS

15   _____/

16                         I.  INTRODUCTION

17        Petitioner Wessel is a state prisoner proceeding pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. §2254.  Petitioner stands convicted of first degree murder

19   with use of a firearm, for which he is currently serving a sentence of 27 years to life.  At issue is

20   the execution of petitioner's sentence, and specifically, a November 29, 2006 decision of the

21   state parole authority that he was not suitable for parole.

22                         II.  BACKGROUND[1]

23        On October 31, 1981, the victim, Christopher Kellmer, and two other individuals

24   _____

25   [1] This summary of the facts of petitioner's offense is taken from the unpublished opinion
     of the California Court of Appeal, Third District, with some modifications as appropriate.  *See*
     *People v. Wessel*, No. 3 Crim. 12429, slip op. at 1-5 (Cal. Ct. of Appeal, Third District December
26   15, 1983).

                                        1

1  stole some marijuana plants from the house of Kelly Manser, a neighbor of petitioner's in a

2  sparsely populated area near Fort Jones, in Siskiyou County.  Petitioner approached the three

3  about returning the marijuana.  Later, he learned that they had not returned the marijuana and

4  were instead selling it.  On November 11, 1982, while in Fort Jones with his wife Georgette and

5  their two children, petitioner encountered Kellmer who was with a friend named Alan Peterson.

6  Verbal threats were exchanged.  Petitioner thrust his foot through the open window of Peterson's

7  car, and attempted to kick Peterson.  Peterson drove off, shouting "I'll be back with my gun."

8       Petitioner located a friend, Wade Penny, to assist him in "resolving the matter"

9  with Peterson and Kellmer.  Petitioner told Georgette to take the children home in their truck and

10 then cruised around in Penny's car, looking for Peterson and Kellmer.  Meanwhile, Georgette,

11 who was driving the truck, saw the Peterson vehicle and followed it out of town.  Gun shots were

12 fired from the Peterson vehicle, after which Georgette noticed that one of her truck's headlights

13 was out.  Georgette returned to town and told petitioner about the incident.  Police were called

14 and investigating officers found a recently fired shotgun in Peterson's car, however no arrests

15 were made.  Neither Peterson nor Kellmer was charged with a criminal offense.

16      Sometime later, petitioner followed Peterson to Kellmer's house to resolve the

17 "feud."  Petitioner got out of his truck and walked toward Kellmer and Peterson.  Kellmer

18 retrieved a shotgun or rifle from his house and threatened to "blow away" petitioner if he came

19 any further into the yard.  Petitioner retreated but also told Peterson and Kellmer that if they

20 didn't leave Georgette and the children alone, he would do "whatever was necessary" to protect

21 himself and his family.

22      On November 25, 1981, Peterson followed petitioner and a friend out of town

23 until petitioner drove through a locked gate into a field.  Once through the gate, petitioner

24 stopped and got out of his truck with his gun.  Peterson stopped his car on the highway about 100

25 yards away, jumped out, and waved a large object.  Petitioner fired a warning shot into the air

26 and Peterson returned to his car and drove back to town.

1    Shortly after this incident, Georgette informed petitioner that whenever she went

2   into Fort James, Peterson and Kellmer would follow her around making obscene gestures and

3   comments.  Petitioner heard from a variety of sources that Peterson and Kellmer had threatened

4   that if petitioner did not quit "messing with them" they would "do away" with Georgette and the

5   children.  Similar threats were directed at petitioner.  Discouraged about police inaction and

6   concerned about the safety of his family, petitioner decided to stay home and avoid going into

7   town.  Eventually he took his children out of school.

8    On January 18, 1982,[2] Georgette returned home from town and advised petitioner

9   that Kellmer and Peterson had threatened in her presence to start taking "pot shots" at her and

10  their children.  Petitioner became angry and decided to take retaliatory action.  Petitioner

11  obtained a gun, test fired and reloaded it, and went into town looking for Kellmer and Peterson.

12  After nightfall he came upon a sled run north of town where he noticed the light of a camp fire

13  on the hill.  Petitioner parked his car and walked up the hill toward a small sledding party

14  gathered by the fire.  Kellmer was among the group.  After observing that no one in the party

15  appeared to be armed with a gun, petitioner approached the group and shot and killed Kellmer.

16   Petitioner was convicted by jury of first degree murder with the special

17  circumstance that he used a firearm.  He was sentenced to a term of 27 years to life. Petitioner's

18  minimum eligible parole date passed on November 4, 1998.  On November 29, 2006, a panel of

19  the Board of Parole hearings ("Board") conducted a subsequent parole suitability hearing.  After

20  considering various positive and negative suitability factors, the panel concluded that petitioner

21  would pose an unreasonable risk of danger to society if released, and thus that he was not suitable

22  for parole.

23  /////

24

25   [2] The California Court of Appeal's decision indicates that petitioner's offense occurred on
    January 18, 1982, although various reports created by the California Department of Corrections
26  indicate the offense occurred on June 18, 1982.

1    Petitioner sought habeas corpus relief in the California state courts.  On January

2  28, 2008, the Siskiyou County Superior Court issued a decision concluding that petitioner had

3  failed to make a prima facie case for relief because the Board's decision was supported by some

4  evidence in the record.  The California Court of Appeal, Third District, and the California

5  Supreme Court likewise denied petitioner's claims on state habeas corpus review, but without

6  written explanation.

7                              III.  CLAIMS FOR REVIEW

8    The petition sets forth three grounds for relief.  Each ground will be separately set

9  forth and discussed herein.  Petitioner claims that:

10    A.    The 2006 parole decision violated the Fifth, Sixth, and
           Fourteenth Amendment by extending petitioner's term of
11          imprisonment beyond the statutory maximum for his
           convicted offense.
12
13    B.    Petitioner's procedural due process rights under the
           fourteenth amendment were violated because he was denied
           the full opportunity to speak.
14
15    C.    The Board of Parole Hearings' decision was not supported
           by any relevant, reliable evidence and was arbitrary in
16          violation of the Fifth and Fourteenth Amendments.

17        IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

18    An application for writ of habeas corpus by a person in custody under judgment of

19  a state court can be granted only for violations of the Constitution or laws of the United States.

20  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

21  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

22  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

23  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

24  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

25  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

26  state court proceedings unless the state court's adjudication of the claim:

4

1            (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

2            determined by the Supreme Court of the United States; or

3            (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

4            State court proceeding.

5  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

6  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

7  This court looks to the last reasoned state court decision in determining whether the law applied

8  to a particular claim by the state courts was contrary to the law set forth in the cases of the United

9  States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v.*

10  *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

11                                  V.  DISCUSSION

12         A.     The Board's denial of parole did not extend petitioner's term of imprisonment beyond the applicable statutory maximum in violation of the

13              constitution or laws of the United States.

14        "Other than the fact of a prior conviction, any fact that increases the penalty for a

15  crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

16  a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (quoting *Apprendi v. New*

17  *Jersey*, 530 U.S. 466, 489 (2000)).  In *Cunningham v. California*, 549 U.S. 270 (2007), the

18  United States Supreme Court held that in California, the middle term of the state's determinate

19  sentencing law is the relevant statutory maximum for *Apprendi* and *Blakely* purposes. *Id.* at 293.

20        Citing *Apprendi*, *Blakely*, and *Cunningham*, petitioner contends that the Board's

21  November 29, 2006 decision to deny parole unconstitutionally increased his sentence beyond the

22  statutory maximum.

23        Petitioner was sentenced to an indeterminate prison term of 27 years to life.  His

24  sentence is, in effect, a sentence of life imprisonment, "subject only to the ameliorative power of

25  the [state parole authority] to set a lesser term." *In re Dannenberg*, 34 Cal. 4th 1061, 1097-98

26  (2005).  Accordingly, it is clear that the Board's denial of parole did not increase petitioner's

1    sentence beyond the imposed term of 27 years to life.

2          Petitioner contends, however, that the applicable statutory maximum is not life

3    imprisonment or even 27 years to life, but instead only 27 years, based on the Matrix of Base

4    Terms for First Degree Murder at 15 Cal. Code Regs. §2403.  But the matrix of base terms in

5    section 2403 applies only when the Board has found an inmate suitable for parole; since

6    petitioner was not found suitable for parole, the matrix does not apply to his sentence.  *See* 15

7    Cal. Code Regs. §§ 2401-2403(a); *see also In re Dannenberg*, 34 Cal.4th at 1071 (holding that

8    the Board is not required to refer to its sentencing matrices in deciding whether a prisoner is

9    suitable for parole).  The California Supreme Court has explicitly held that the obligation to

10   calculate a prisoner's base term under section 2403 arises only *after* an inmate has been found

11   suitable for parole.  *In re Dannenberg*, 34 Cal.4th at 1078-80, 83.  Thus, California law is clear

12   that the matrices applied by the Board and cited by petitioner here do not set forth the statutory

13   maximums for sentencing purposes.  *See Id*.  This court is bound by the California Supreme

14   Court's interpretation and application of state law.  *See Hicks v. Feiock*, 465 U.S. 624, 629-30 &

15   n.3 (1988); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995), *cert. denied*,

16   516 U.S. 1124 (1996).

17         Moreover, the federal rights set forth in *Apprendi* and its progeny apply

18   specifically to trial court sentencing proceedings, and not to post-conviction determinations for

19   which there is no right to jury trial.  *See generally United States v. Huerta-Pimental*, 445 F.3d

20   1220, 1225 (9th Cir. 2006) (discussing supervised release, its revocation, and associated

21   penalties, which are part of the original sentence authorized by the fact of conviction).  No

22   Supreme Court precedent clearly establishes that the rule of *Apprendi* applies in the parole

23   suitability determination context.  Accordingly, the decision of the Siskiyou County Superior

24   Court that petitioner failed to make a prima facie showing for relief on this ground is not contrary

25   to, or an unreasonable application of federal law.

26   /////

1

2

   B.   Petitioner was not denied the opportunity to be heard at the November 29, 2006
        parole suitability hearing in violation of the 14th Amendment.

3          The Due Process Clause of the Fourteenth Amendment to the United States

4 Constitution prohibits state action that deprives a person of life, liberty, or property without due

5 process of law.  In general, a person alleging a due process violation must first demonstrate that

6 he or she was deprived of a protected liberty or property interest, and then show that the

7 procedures attendant upon the deprivation were not constitutionally sufficient.  *Kentucky Dep't.*

8 *of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895,

9 900 (9th Cir. 2002).

10         A protected liberty interest may arise from either the Due Process Clause itself or

11 from state laws.  *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States

12 Constitution does not, in and of itself, create for prisoners a protected liberty interest in receipt of

13 a parole date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If a state's statutory parole scheme

14 uses mandatory language, however, it creates a presumption that parole will be granted, thereby

15 giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (citing *Greenholtz v.*

16 *Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).  California's statutory scheme for

17 determining parole for life-sentenced prisoners provides, generally, that parole *shall* be granted

18 "unless consideration of the public safety requires a more lengthy period of incarceration."  Cal.

19 Penal Code §3041 (emphasis added).  This statute gives California state prisoners whose

20 sentences carry the possibility of parole a clearly established, constitutionally protected liberty

21 interest in receipt of a parole release date.  *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007)

22 (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*,

23 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; *Allen*, 482 U.S. at 377-78

24 (*quoting Greenholtz*, 442 U.S. at 12)).

25         The full panoply of rights afforded a defendant in a criminal proceeding is not

26 constitutionally mandated in the context of a parole proceeding.  *See Pedro v. Or. Parole Bd.*,

7

825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's

procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a

decision informing him of the reasons he did not qualify for parole.  *Greenholtz*, 442 U.S. at 16.

Here, petitioner contends that he was denied the opportunity to be heard in that

"he was denied the opportunity to rebut statements made by the Deputy District Attorney and the

victim's next of kin regarding matters not in the record."  This particular claim was denied

without written explanation in all state habeas corpus proceedings.  Thus, this court

independently reviews the record to determine whether the state court clearly erred in its

application of controlling federal law.  *Luma v. Cambra*, 306 F.3d 954, 960 (9th Cir. 2002),

amended by 311 F.3d 928 (9th Cir. 2002).

A representative from the District Attorney's Office spoke at petitioner's

November 29, 2006 parole suitability hearing.  The Deputy District Attorney stated regarding

petitioner's parole plans:

> ...Mr. Wessel has insufficient parole plans, and that causes
> significant concern.  He has not put plans in place.  He was
> mistaken about the offers of others.  And he does not have the kind
> of plans that would give any confidence that he would have any
> stability in his life if he were to achieve parole.

(Subsequent Parole Consideration Hearing, State of California, Board of Parole Hearings,

November 29, 2006 ("Transcript") at 77.)

At the beginning of petitioner's closing statement, the following exchange

occurred:

> **INMATE WESSEL:**  [B]efore I start, I would like to mention that
> the hearing before last, I litigated.  And in order to do that, you
> have to first exhaust the appeal remedy that was in place at that
> time.  And my response to whoever makes the denial or the
> granting of those appeals was that my parole plans at that time
> were adequate.  They haven't changed a whole lot.  The location of
> the house perhaps has changed, but at that time, I didn't have a job
> promised.  And I've stated the reasons why I haven't pursued one
> because it is – as the California District Attorney Association states
> in their manual preparing District Attorneys for hearings, its
> unreasonable to expect an inmate to have a job promised to them

1    when they don't know when they are getting out.

2    **PRESIDING COMMISSIONER SHELTON:** Mr. Wessel, the
     purpose of your closing statement is to tell us why you think you're
3    suitable for parole.

4    **INMATE WESSEL:** Let me get to that.

5    **PRESIDING COMMISSIONER SHELTON:** No.  Let's do It
     now.
6
     **INMATE WESSEL:** Okay.  Words cannot fully express the regret
7    and shame I feel for taking Chris Kellmer's life, and for the pain
     and suffering that I have caused Chris' family and my own family...
8

9    (Transcript at 86-87.)

10            Petitioner argues that the Board prevented him from rebutting the Deputy District

11   Attorney's claims regarding the adequacy of his parole plans.  The record does not support his

12   assertion.  Although the District Attorney made no specific comment on petitioner's lack of a job

13   offer, petitioner began his closing statement by discussing previous litigation and his belief that it

14   is unreasonable to expect a prisoner to secure a job offer prior to release.  At that time, petitioner

15   was advised that the purpose of his statement was to state why he thought he was suitable for

16   parole, and instructed to do so at that time.  While the Board directed petitioner to move on from

17   his argument about previous litigation and the contents of the District Attorney Association's

18   manual regarding job offers, at no time did the Board prevent him from expressing the adequacy

19   of his parole plans or rebutting the District Attorney's argument about the adequacy of his parole

20   plans.  There is no merit to petitioner's contention that he was unconstitutionally denied his

21   opportunity to be heard on this basis.

22            The victim's mother also spoke at the parole suitability hearing, pursuant to Cal.

23   Penal Code §3043.  Prior to her statement, she was advised to confine to her view of the

24   commitment offense, its impact, and her views on the person responsible; she was also informed

25   that if she exceeded these guidelines, or presented new information, then petitioner's attorney

26   had the right to challenge her statement and could be afforded an opportunity to rebut the new

1   information.  (Transcript at 89.)  The victim's mother spoke at length about the effects of

2   petitioner's offense on her family, including effects from media attention.  She expressed her

3   view that petitioner and his wife had attempted, in the aftermath of the offense and during trial,

4   to discredit the victim's reputation through rumors and lies, and implied that she believed

5   petitioner had exaggerated or fabricated many of the events that allegedly lead up to the offense.

6   (Transcript at 93-94.)  She stated she feared that petitioner, if released, would seek "revenge" on

7   her family.  She claimed that petitioner had threatened to kill her husband prior to his arrest.  She

8   also accused him of having tried "to kill Alan Peterson and his 15 year old girlfriend in a drive-

9   by type shooting" sometime later that night after the offense was committed.

10          Petitioner's attorney made no objections to the victim's mother's comments.

11   Following her statement, the panel recessed for deliberation.  Petitioner contends that the

12   victim's mother mentioned various details regarding petitioner's offense that are not a part of the

13   official record, after which neither petitioner nor his attorney "were afforded an opportunity" to

14   refute such statements.

15          It is true that neither petitioner nor his attorney refuted any of the victim's

16   mother's statements, however, this appears to be because neither petitioner nor his attorney

17   objected to the victim's mother's comments or requested an opportunity to rebut any of her

18   statements.  The presiding commissioner specifically stated, prior to the victim's comments, that

19   petitioner's attorney could object to any new information presented.  Neither petitioner nor his

20   attorney made objection to any of the victim's mother's comments, or requested another

21   opportunity to speak.  The record does not support a finding that petitioner was deprived of the

22   opportunity to be heard regarding statements made by the victim's mother, he simply did not

23   exercise the right nor did his attorney on his behalf.

24          In any event, no Supreme Court precedent clearly establishes that an inmate's

25   right to be heard at a parole suitability hearing encompasses the right to rebut or challenge

26   information presented by an adverse witness such as a Deputy District Attorney or the victim's

next of kin.  In holding that an inmate must be afforded an opportunity to be heard at his parole

hearing, the United States Supreme Court has expressly declined to consider whether the right to

be heard includes a right to confront an adverse witness.  *See Greenholtz*, 442 U.S. at 16, n.8

("we express no opinion" on whether due process provides "a right to cross-examine adverse

witnesses").  On the facts of this case, where petitioner testified at length and both petitioner and

his attorney were afforded the opportunity to address petitioner's suitability for parole in a

closing statement, the state court did not unreasonably apply clearly established federal law in

concluding that petitioner was not denied his right to be heard at his November 29, 2006 parole

suitability hearing in violation of the 14th Amendment.

        C.     The Board's decision was supported by some evidence in the record and
             thus did not violate petitioner's right to due process of law.

        In addition to the protections afforded under *Greenholtz*, as a matter of state law,

denial of parole to California inmates must be supported by at least "some evidence"

demonstrating future dangerousness.  *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir.

2010) (en banc) (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002), *In re Lawrence*, 44 Cal.4th

1181 (2008), and *In re Shaputis*, 44 Cal.4th 1241 (2008)).  California's "some evidence"

requirement is a component of the liberty interest created by the state's parole system."  *Cooke v.

Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The federal Due Process Clause requires that

California comply with its own "some evidence" requirement.  *Pearson v. Muntz*, 606 F.3d 606,

609 (9th Cir. 2010) (per curiam).  Accordingly, the United States Court of Appeals for the Ninth

Circuit has held that a reviewing court such as this one must "decide whether the California

judicial decision approving the... decision rejecting parole was an 'unreasonable application' of

the California 'some evidence' requirement, or was 'based on an unreasonable determination of

the facts in light of the evidence.'"  *Hayward*, 603 F.3d at 562-63 (citing 28 U.S.C. §2254(d)).

        The analysis whether some evidence supports a parole decision in California is

framed by the state's statutes and regulations governing parole suitability determinations.  *See*

1   *Irons*, 505 F.3d at 851.  Title 15, Section 2402 of the California Code of Regulations sets forth

2   various factors that must be considered by the Board in its parole suitability findings for

3   murderers.  The Board is directed to consider all relevant, reliable information available

4   regarding

> the circumstances of the prisoner's social history; past and present
> mental state; past criminal history, including involvement in other
> criminal misconduct which is reliably documented; the base and
> other commitment offenses, including behavior before, during and
> after the crime; past and present attitude toward the crime; any
> conditions of treatment or control, including the use of special
> conditions under which the prisoner may safely be released to the
> community; and any other information which bears on the
> prisoner's suitability for release.

15 Cal. Code Regs. §2402(b).  The regulation also sets forth "general guidelines" (*see In re*

*Aguilar*, 168 Cal.App.4th 1479, 1487 (2nd Dist. 2008)) which tend to show unsuitability or

suitability for parole:

> (c) Circumstances Tending to Show Unsuitability. The following
> circumstances each tend to indicate unsuitability for release. These
> circumstances are set forth as general guidelines; the importance
> attached to any circumstance or combination of circumstances in a
> particular case is left to the judgment of the panel. Circumstances
> tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the
> offense in an especially heinous, atrocious or cruel manner....
>
> (2) Previous Record of Violence. The prisoner on previous
> occasions inflicted or attempted to inflict serious injury on
> a victim, particularly if the prisoner demonstrated serious
> assaultive behavior at an early age.
>
> (3) Unstable social history.  The prisoner has a history of
> unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses. The prisoner has previously
> sexually assaulted another in a manner calculated to inflict
> unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy
> history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in
> serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Regs. § 2402(c)-(d).  The fundamental consideration is public safety.  15 Cal. Code Regs. §2402(b).

Since the overriding concern is public safety, the proper focus is on the inmate's *current* dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205.  The applicable standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some

1    evidence indicates that the inmate's release would unreasonably endanger public safety.  *In re*

2    *Shaputis*, 44 Cal.4th at 1254.  In other words, there must be a rational nexus between the facts

3    relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.

4    *In re Lawrence*, 44 Cal. 4th at 1227.

5                    In this case, the panel of the Board presiding over petitioner's November 29, 2006

6    parole suitability hearing commended him for various positive achievements:

7                    I do want to put on the record, Mr. Wessel, all the things that you
                     have done in the last 24 years because you have done a lot... First
8                    of all, we want to acknowledge that you have no gang affiliation.
                     You did receive your GED in 1988.  Your latest TABE score was
9                    12.9 in March of '06.  You received or completed 30 unites of
                     college between the years of '88 and '95 in a basic education field
10                   working towards an A.A.  You have, with regards to work, this
                     seems to be your strongest area.  You're currently involved in the
11                   vocational office services.  And it appears that you think you've
                     completed all but three of the programs.  You spent five years at
12                   Folsom in the tool and die shop, and also in metal fabrication as a
                     welder, four years.  You're state certified as a journeyman, and you
13                   have done over 6400 hours, I think, in that arena.  You had a
                     vocation in building maintenance in 1990.  And you've taken upon
14                   yourself to put yourself on the waiting list, PIA waiting list, for
                     laundry, tool and die shop and PIA welding.  That is all to be
15                   commended.  Excellent, excellent work.  You have great work
                     ethics... and you're making up for [previous shortcomings] now....
16                   Self-help.  You participated in A.A. until June of '94.  And then
                     you started participating in Rational Recovery Program in '97, at
17                   which time you were baptized as Jehovah Witness.  You
                     participated in the substance abuse program in '98, stress
18                   management – I think that was in '05.  And in March '06,
                     Fatherhood Program through The Friends Outside.  You had shown
19                   us a Criminon certificate and we discussed that a little bit.  You
                     completed the program in 2000... I think that pretty much covers
20                   what we talked about.

21   (Transcript at 107-08.)

22                   Despite these positive factors in the record, the panel ultimately found petitioner

23   unsuitable for parole.  The panel explained their decision to deny parole as follows:

24                   [I]t's a two year denial.  We have some very specific things that
                     we'd like you to participate in, and we'll get to that.  First of all, I
25                   need to address the commitment offense.  The offense was...
                     carried out in a dispassionate and calculated manner, and the
26                   offense was carried out in an especially cruel and callous manner.

                                                    14

One victim was attacked and killed.  And I have to tell you, Mr. Wessel, you were extraordinarily lucky that more weren't hurt when you were shooting that gun around there that evening.  The offense was carried out execution style.  You knew what you were doing.  You went to get a gun.  You checked it out to make sure it worked, and your intent was to kill Mr. Kellmer.  The offense was carried out in a manner which demonstrated callous disregard for human suffering.  And I guess in my mind, the motive for your participation in this crime is inexplicable because you were defending someone else's marijuana.  You had no right to even be anywhere involved in this situation.  And you took it upon yourself to try to fix something that was none of your business, and that's the bottom line.  These conclusions are drawn from the statement of fact that came from the July 5, 2006 Board Report.  We have been through the summary of the offense, and I do not wish to put the family through the details again.  In regards to your prior record, you had no juvenile record.  You had a burglary second and your sentence for two years in prison was suspended.  You received – you were charged with battery and a drunk driving.  And I will probably discuss your prior record a little bit more when we come to the interventions you've been participating in, especially when it comes to your determination that you are not an alcohol[ic] or an addict.  You have a record of assaultive behavior.  You have an escalating pattern of criminal conduct.  You have a history of unstable relationships with others.  And you were on probation at the time this happened.  There had been some interventions in your life to try to help you adjust to some of the mistakes you've made.  Unfortunately, you continued to take matters in your own hand.  With regards to your institutional behavior, you've done a bunch of wonderful things and I'm going to get into that shortly.  I want to make sure all of that is on the record because you have worked hard in variety of ways.  But you also have some gaps that we will address as well.  We both feel that your programming has been limited and we would like to see you spend a little bit more time trying to upgrade educationally.  You got your 30 units in college.  That was in '88 to '95.  And we believe you've not sufficiently participated in beneficial self-help or therapy programs.  You've received three 115s, the last one being in 1994.  You've received six 128s, the last one being in 1989.  With regards to the psychiatric evaluation, again I think we would all agree in this room, the psychiatric evaluation, again I think we would all agree... [the doctor's comparison of you to] other inmates does not give us any kind of additional information that would help us determine your level of dangerousness within the community.  So we have asked for an additional psychiatric evaluation for you to be completed prior to your next hearing with that specific statement made, that whoever does an analysis as to your danger in the community would deal with that as a comparison to the average citizen, not a lifer inmate... [¶] With regards to your parole plans, regardless of your introductory statement at the time of your closing statement, your parole plans are not strong to us.  You

know, every panel, every parole board has a difference of opinion about what works and what doesn't work, and what – you know, you haven't been here for two years.  Things change.  You yourself said the location has changed.  You have extremely strong, solid, good vocational experiences.  But being a felon out in the community, especially Siskiyou County, it's another small locale, it would be very difficult to go knocking on doors without doing some preparatory work ahead of time to try to get your foot in the door to look for some way to employ yourself.  Since the only way you ever employed yourself in your past life was to grow marijuana, I'm not convinced that you're going to sell somebody on hiring you unless you set the stage for that a little bit ahead of time.  So I think you need to do some work.  Send out some letters.  Advertise your resume.  You've got – you're working on your fourth vocation.  You've got a lot of skills and talents you can put together, but you have to do it the right way.  You just can't walk out of here and say, "I'll flip hamburgers."  You got a lot more to offer than that when you earn a parole date someday, if you earn a parole date someday.  I'm just saying you need to set the stage to prepare yourself to be able to take care of yourself in the best way you possibly can.  When you have a new parole hearing, have your letters current.  Get new letters that indicate exactly where you're going to live.  These letters were vague, so make sure in the body of the letter that whoever is inviting you to come live with them, that they're offering you a residence, where the location is, etc.  And I'm always interested in hearing who you've written to and applied to for work.  Even if you don't get any answer or no answer, save all the copies of your applications and information, all right?  You obviously were aware of some of the job opportunities available to you in the community.  Saying that you don't want to put them out until when you get a parole date isn't helping you.  And I've had many, many hearings with men coming before us with jobs.  So do some homework.  And there were job offers and they didn't know any more that they were going to have a parole date than you do.  So keep that in mind.  You've got to work to prepare for yourself.

(Transcript at 101-107.)

...So I am going to tell what we feel you need to work on.  This is kind of a summary.  First of all, we discussed the fact you need a new psych that addresses the criteria within the community appropriately, all right?  You need to shore up your parole plans, update your letters, do some of the things I just talked to you about with regards to employment.  There's a couple of areas that we feel that you're very weak in, and one is dealing with your issues of addiction.  I don't know how to guide or direct you in that area other than to say this: With regards both to areas of addiction, whether it's alcohol or drugs, and all of your programming issues, this Board would like to see you open yourself up and avail

16

1            yourself to the opinions of others.  Interact with other people,
whether you like what they have to say or agree with what they
2            have to say.  We view you as having isolated yourself.  As an
individual, Commissioner Moore or myself, nobody in this room
3            can stand alone without some help at some time in their lifetime.
One of the things that you talked about was taking care of your
4            own needs and finding strength in your own beliefs, such as your
Rational Recovery Program.  We would like to see you expand
5            your horizons.  Be open to the thoughts and dreams and wishes of
other people.  Other people's experiences.  Sometimes there is a
6            major gift in this world of knowing you're not walking alone.  That
alone is the healing process.  And we all need to avail ourselves of
7            a healing process.  So as I also indicated, we would like to see you
do anything you can to upgrade your education because you got a
8            good start there.

9  (Transcript at 109-10.)  Another commissioner continued:

10            Mr. Wessel, AA is not the only path to remain clean and sober.
This panel would not suggest it was the only path.  Abuse of
11            drinking is – you don't like the word and you do not believe in the
word addiction for yourself.  I might suggest to you and I'll submit
12            to [you] that is substance abuse.  You sat here and you told us that
every time you drank, you drank to get drunk.  That is not how a
13            normal drinker drinks... Your description is someone that abuses
substances, whether you call it addiction or not.  And the abusive
14            drinking that you described is a symptom of a greater problem.
You drank to get drunk, to change your reality.  What is it you
15            were trying to quell in you?  What was it you were trying to bring
out in you [that] you could only find through alcohol[?] And what
16            actions have you substituted for drinking? ...[I]f you are not going
to do A.A., if you are not going to participate because there are
17            alternative methods, your expression of what it is that you
accomplish on a daily basis, because staying clean and sober just
18            makes you a dry drunk and doesn't allow us to see what you're
doing in the alternative.  Have you developed a plan, and I don't
19            know if that's the pain [sic] – the literature of Rational Recovery.  I
don't know if that's to participate in other substance abuse self-
20            help programs that are offered here at the institution.  But it has to
be something... [I]t's very easy to look for the differences between
21            you and others than it is to look for the similarities [sic].  You may
want to change that around.  It's like getting a new set of glasses.
22            My perception is if you do only what is comfortable and only what
you're good at or what you can get good at, and the words that the
23            Commissioner used was, you isolate yourself [sic[.  That's the
perception today.  You cannot do this by yourself inside or outside
24            and be successful.  If you do what you've always done, you will get
what you've always gotten.

25

26  (Transcript at 110-11.)

1    Thus, in finding petitioner not suitable for parole the Board relied in part on the

2    nature and gravity of petitioner's commitment offense, but also on various other factors.

3    The circumstances of petitioner's commitment offense indeed appear to fit the

4    state regulatory description for one that is especially aggravated.  *See, e.g.*, 15 Cal. Code §2402

5    (c)(1)(B) ("The offense was carried out in a dispassionate and calculated manner, such as an

6    execution-style murder."); §2402 (c)(1)(E) ("The motive for the crime is inexplicable or very

7    trivial in relation to the offense.").  In order for these circumstances to support the denial of

8    parole, there must be some indication that they remain probative to the statutory determination of

9    petitioner's current or future dangerousness.  *See Cooke*, 606 F.3d at 1216 (quoting *In re*

10   *Lawrence*, 44 Cal. 4th 3d at 1214).  The California Supreme Court has explained "it is not the

11   circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole-

12   it is the implication concerning future dangerousness that derives from the prisoner having

13   committed that crime."  *In re Lawrence*, 44 Cal.4th at 1207.  In other words, California law

14   authorizes the Board to consider the circumstances of the commitment offense, but only insofar

15   as those circumstances relate to the inmate's current dangerousness.  *In re Lawrence*, 44 Cal.4th

16   at 1214.

17   Importantly, in this case, the Board did not rely exclusively on circumstances

18   related to petitioner's commitment offense to support the denial of parole.  The Board

19   additionally appeared to rely on (1) petitioner's criminal history; (2) his attitude towards previous

20   substance abuse and belief that he was not an alcoholic or addict; (3) insufficient self-help and

21   other group programming; and (4) inadequate plans for parole, among other factors.

22   Petitioner has no juvenile record.  As an adult, he sustained convictions for second

23   degree burglary in 1976, battery in 1977 and drunk driving in 1979.  Petitioner was on probation

24   at the time of the commitment offense.

25   Despite admitting that he purposely became intoxicated in order to commit the

26   offense, that he used alcohol "to excess," that he "abused" marijuana, and that he drank and used

18

marijuana from the age of 13 until sometime after entering prison, quitting only for "relatively short periods of time," petitioner denied that he is a recovering alcoholic or addict.  Rather, he stated that he defined an alcoholic or addict as a person that is unable to choose to stop, and stated that since he abstained for periods of time, whether it was for "financial reasons" or otherwise, he did not consider himself an alcoholic or addict.  (Transcript at 36-38.)  The Board is authorized to consider petitioner's "past and present mental state" and "past and present attitude toward the crime" and attitude toward previous substance abuse and prevention of future substance abuse.  *See* 15 Cal. Code Regs. §2402(b) ("All relevant reliable information available to the panel shall be considered...").  In this case, it was not unreasonable for the Board to conclude that petitioner's plan for substance abuse prevention was inadequate in light of his history of substance abuse, the link between alcohol, drugs, and his previous criminality, and limited substance abuse and other self-help programming in prison.

With respect to his plans for parole, petitioner stated he would prefer to live somewhere in Siskiyou County.  The couple he had previously planned to reside with, however, no longer lived there.  Petitioner produced a letter of support from a friend and another from his father, but neither expressly offered him a place to live.  Petitioner indicated that, in the alternative, he could reside with his mother in Mendocino County; it was not clear from the transcript of the parole suitability hearing whether the letter submitted by petitioner's mother included an offer of residence.  (Transcript at 60-66.)  With respect to employment, petitioner indicated that he had not pursued any jobs in Siskiyou County because it was such a small community with a high unemployment rate.  On this record, and for the reasons given in the Board's decision, a conclusion that petitioner still posed a risk of danger or threat to public safety based on his inadequately developed plans for parole was not unreasonable.  It should be noted that the Board did not rely solely on petitioner's lack of a job offer in order to find his plans for parole to be inadequate; rather it was the overall uncertainty of his plans, including those related to residence and employment, that the Board found to be insufficient.

1    In sum, the record contains with respect to an assessment of petitioner's current

2  dangerousness many positive factors, but also contains various negative factors that tend to show

3  he is not suitable for parole.  Due process requires only that the Board's decision be supported by

4  some evidence in the record.  The circumstances of petitioner's commitment offense, combined

5  with his criminal history and previous substance abuse, limited substance abuse and other self-

6  help programming in prison, current attitude toward previous alcohol and drug use and future

7  substance abuse prevention, and inadequately developed parole plans suffice to support the

8  Board's November 29, 2006 decision that petitioner was not suitable to be released on parole at

9  that time.  Accordingly, petitioner is not entitled to relief for his claim that the Board's denial of

10  parole was unsupported by any relevant, reliable evidence in the record.

11                              VI.  CONCLUSION

12    For the foregoing reasons, IT IS HEREBY RECOMMENDED that the application

13  for writ of habeas corpus be DENIED.

14    These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 21 days

16  after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within seven days after service of the objections.  Failure to file

20  objections within the specified time may waive the right to appeal the District Court's order.

21  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

22  1991).

23  DATED: December 7, 2010

24                                        CHARLENE H. SORRENTINO
                                          UNITED STATES MAGISTRATE JUDGE
25

26

                                        20